Good morning, Your Honors. Matthew Butler on behalf of a certified class of 1,166 employees. Before I get started, I'd like to ask to reserve three minutes, if I may, for rebuttal. Your Honors, this case is a 502A3 ERISA breach of fiduciary duty case, and we ask you to reverse and remand for two main reasons. First, Liberty Mutual's three straightforward breaches of fiduciary duty cannot be adjudicated as a matter of law. Don't move away from the microphone, because our PA system is not the best, and everything you say is recorded. All right. I apologize, Your Honor. You've got cameras over there, too. Just smile. I'll do the best I can. All right. So, besides the fact that the breaches of fiduciary duty cannot be adjudicated as a matter of law, there are available equitable remedies under 502A3. Turning first to Liberty's straightforward breaches of fiduciary duty, here there are three. Liberty didn't tell them about past service credit. They ignored repeated inquiries about past service credit, and they failed to meet their obligations, their statutory obligations, to disclose the information in summary plan descriptions. Turning first to Liberty didn't tell them. Liberty told them about past service credit for medical benefits, for long-term disability, for short-term disability, for parts of the pension plan, vesting, eligibility, early retirement, spousal benefits. But Liberty didn't tell them that at the time, in 1997, Liberty did not intend to give them past service credit when calculating the amount of money they would get in their retirement benefit. In 1997, when they held 25 benefit enrollment meetings, they talked to 1,100 employees. They told them all those reasons they would get it, but not the one reason that had the money to it that they wouldn't get it. Now, the lower court here, Your Honor, addressed that in the summary plan descriptions. Let me ask you this. If they haven't had those meetings, let's say just take the meetings out of it, and then when they look at the plain language, if you take the meetings out of it and you look at the plain language, would you have a much more difficult situation? Because in that situation, if you look at the plain language and say, I'm just asking you to assume this, just for, because I know those are not the facts here. But if it were just the plain language, then it would be more likely they would be entitled to an abuse of discretion standard, and if the interpretation of the plan documents is reasonable, then the plan wins, right? That's under a 502A1B claim, Your Honor, which is the claim for benefits under the plan. There's a separate claim, which is the focus of this case, which is a 502A3 claim, and it's akin to a common law claim for fraud. The fraud test is a little different, which I would like to talk to when we talk about remedies, but it is akin to common law fraud. So you're correct that the standard of review for 502A1B for interpretation of the plan is firestone deference, and that is because the plan provides for deference to the plan administrator, then we give, we test it with an abuse of discretion standard when analyzing their decision, and that is tempered based upon a conflict of interest. See, I think your best argument, and this is just me, well, we haven't talked about the case or anything, but this is that regarding count two, and that, but when I get to count two, I have Ford versus MCI, and then, which stands for the proposition that you can't simultaneously proceed under 1132A1 and 1132A2, 1132A3, but then you have Cigna, Cigna versus Amara, and the question is, does that abrogate that? So... It does, Your Honor, and that's been found in the Second Circuit in Silva. This is the Ninth, though. And the reason is simple. Because the trial court, when the case is heard... But you can't get double relief, right? Exactly. So the trial court under A3 can award appropriate equitable relief. That's what A3 allows. Double recovery would not be appropriate. But let's say, all right, let's say I agree with you on that. I'm just making an assumption. But let's say I disagree with you on, it would be then 134, I guess? Are those the other counts? Yes, the first count is A1B. Yes. So is your relief different under two than it would be under 134? The relief is the same under two and four. The SPD claim, 29 U.S.C. 1022, is a claim for violation of the disclosure regulations. We will also seek A3 relief as a result of that violation. The A1B relief is different. The A3 relief that we will seek is reformation of the plan, which requires mutual mistake or the mistake of one combined with the fraud of the other. So let's just say if hypothetically that were the direction that we went, is the class certification still, the class certification was made with all four of them, correct? It is. That's correct. So does that affect the analysis of the class certification and whether we have commonality and typicality? It does not. The trial court analyzed class certification given the remedies that were requested at the time, which are the same that they are today. So that would be an abuse of discretion standard, which, I mean, can be overrun, but it's a better standard for you. And an even higher abuse of discretion standard when the class is certified. All right. I have a little question about Moyle, though, as well, because why aren't his claims barred by the statute of limitations? Considering that he kept filing lawsuits, doesn't that show that he believed that the plan had made a clear and continuing repudiation of his claims several years before he filed this class action? Good question, Judge Callahan, and what I would say to that is this. We didn't get a final denial of the claim until 2009. As you know, Mr. Moyle went through repeated procedural hoops from 2002 to 2009. Regardless of what happened in those time frames, he was ordered that he needed to get an administrative review. He conducted the administrative review, submitted a claim in 2008. It was denied. There was an appeal of that claim, and there was a final denial in October of 2009. You would not have clear and continuing repudiation under this court's four cases, Wise, Withrow, Wetzel, and Chuck. You wouldn't have a continuing repudiation until you got that final denial where Jeffrey Moyle knew that he had no other way to get any relief through an administrative process. Okay. Going back to the class certification, I'm still having a little bit of trouble with, if it were under three, why aren't there individualized issues regarding what Golden Eagle employees thought the plan meant and how they may have relied on these interpretations? You know, how would I know, you know, because commonality, you basically have to have, okay, what's the one question that answers? Oh, okay, what's the one question that we can answer as to everyone? And if reliance is called into play, how wouldn't that make it defeat the commonality? I can answer the two parts of that question, commonality and reliance, actually with two simple points. The first of those points is A3 is based upon a statutory disclosure obligation of 29 U.S.C. 1022 and its corresponding regulations. The test for that analysis is a reasonable person standard, not an individual participant standard. In other words, what's required under 1022 is the disclosure of anything that may result in disqualification, ineligibility, loss, or denial of benefits that a reasonable participant would expect. Because it's a reasonable person standard, the class certification is not challenged on a commonality issue. Second, the trial court's order here on commonality relied upon facts that are indisputed. Facts like there was a facilitator guide that was prepared. We had a couple of scripts, I guess, right? A facilitator guide that was prepared that was required to be followed as a script for 25 benefit enrollment meetings where the goal was to describe a uniform set of benefits to the Golden Eagle employees. Those facts, there's no evidence that could undermine the trial court's decision in that regard. We have to give the trial court discretion, and the test has to be abusive discretion and an even higher abusive discretion because the class was certified. Now, is there a phone script too? I'm sorry, what? Phone call, there's a hotline, right? Is there a script on that? There was a hotline prepared as well. Is that the same as the other script, or is it different? There's no evidence in the record of difference between those scripts, nor is there any evidence in the record submitted by Liberty Mutual that anyone called and was told they didn't get these past service credits. In fact, of all the hundreds of declarations that were provided by class members, there's not a single class member who came forward and said, Liberty Mutual did disclose this to me, not a single one. The narrow question is, was Liberty Mutual obligated to disclose when they bought Old Golden Eagle that those employees' time at Old Golden Eagle didn't count when they figured out how much their retirement was going to be? Figured out what? How much their retirement was going to be. Speaking of. Okay, so when they were at Golden Eagle, my understanding is they got paid more, but they had no retirement, right? They had a 401K, but not a pension. But not a pension. That's right. This is an important fact, Your Honor, if I may. Okay. Because Liberty Mutual knew they didn't have a pension. So Liberty Mutual knew that these employees were unfamiliar with complex pension terms like vesting, eligibility, benefit accrual, early retirements, spousal benefits. And they didn't tell them, yeah, come on over, you'll get it for vesting, but when we figure out how much we owe you, we're not going to count that time. Well, let me ask you this. Is the reasonable person question, let's say that it goes forward and it's the reasonable person question, would it be factored in at that point? If you weren't paying anything into a pension plan, is it reasonable to think that you would be getting pension payments for that time? In this case, it was reasonable, and let me tell you why. Well, no, I mean that's got to be decided otherwise. But would that argument be, would they be able to put that argument in there at that point? In this case, no, that's not relevant. And the reason is this was not a standard transaction. This was a bidding war between Liberty Mutual and AIG in a conservation proceeding, basically with a judge trying to pick the best bid. And if you look at the ER 3947, the most important piece of evidence in this case, Liberty Mutual was asked a question about these employees on the record, at the hearing to confirm their bid, and Liberty said, you know what, AIG matched our bid on everything, but they want these employees to come in as new hires. We don't. We want to bring them in. We want to put them in the pension plan, and we're going to give them credit for their time at Old Golden Eagle like they were Liberty employees with X years of service. That was the impression they wanted the court to have. That was the impression they wanted the employees to have, because they wanted all those folks to come over. The employees expressed their desire to have the court side with Liberty Mutual in selecting whether Liberty Mutual or AIG would get the court's nod. They did, Your Honor. There are two anonymous letters that you can find at ER 3066 to 3069. Not only did the employees provide their support because of Liberty's communication pattern, but they focused on Liberty's long-term plan. Those anonymous letters used the words long-term view. Liberty had a comprehensive communication pattern that it developed in March of 1997, and that's in the Project Golden Opportunity Human Resources Analysis. When they decided to take this company over, they analyzed what do we need to do to deal with the perceived value problem because our compensation plan is more benefits-based than salary. And what they did is they decided to overemphasize the value of that pension. Now, this case was decided on summary judgment as far as the equitable aspects are concerned. And were there disputed factual issues? The court's finding, Your Honor, was based on a technicality rather than the facts of the A3 claim. The court's finding was based upon the remedy being unavailable, and the Ninth Circuit case abassed. But the court mistakenly believed But just I think from the standpoint the court just decided you can't do 1 and 3, right, both, and so didn't get to it. So let's say you went on 2. Let's just assume if we reverse on 2. You could face another summary judgment motion on that, right? Yes. Because the court did not really reach. The court just basically said you followed forward, and that was before Amara, right? Yeah, the court, similar, yes, Your Honor. The court did not allow the A1B claim and the A3 claim to go forward at the same time, mistakenly believing that that was not precluded by Amara. But the law has changed. Amara allows for equitable relief. So, but you would concede if you were to prevail on 2, you know, say if this court reversed on 2 and said summary judgment was inappropriate in light of Amara and that Amara took away the underpinnings of Ford, they could still bring another summary judgment on 2, on count 2. On count 2. Yeah. Because it wasn't really decided. Yes. It was just legally the district court said, hey, you can't have both 1 and 3, under sections both 1 and 3. Yeah, I'm confused, Your Honor. I know. 1 and 4. Okay. But there is one caveat to that. The court said you may not recover under both 1132A1 and 1132A3. Those are counts 1 and 2. Oh, okay. And then I believe count 4 is the summary plan description claim. Okay. And the reason that I draw that distinction, Your Honor, is the summary plan description claim, as you know, 29, 10, 20. Well, see, I thought count 2 was the breach of fiduciary duty under 1132A3. It is. So count 1 is A1B. Count 2 is A3. Count 3 is no longer at issue. Count 4 is the summary plan description claim, which is the statutory disclosure claim. Okay. Is there a question that I can answer, or can I talk to the summary plan description? Well, you don't have much time left if you want to save any time. I do want to save my time for rebuttal unless Your Honors have any other questions. Thank you very much. We're going to take a brief recess. So how much time do you think you have? Are you all? 20. But you're from? Ashley Abel, for the defendants, at least. What did you ask him? You're for? Okay. So because each side has a certain amount of time. Okay. But you're not with? No, no. Okay. Okay. All right. I was kind of getting. And then I thought, oh, no. Someone else thinks that they. He's a nice enough guy, but we're not on the same side of the case. I think we're going to take another short recess. Judge Pegerson? What? We're taking another short recess? Yes. Oh, okay. We're taking another short recess. All right. All right. We're going to take another short recess.  Okay. Oh, yeah. This court stands in a short recess. This court stands in a short recess.  Thank you. very much. Thank you. Thank you. Thank you so  All rise for the presentation. This court resumes its session. Larissa. May it please the court. Your Honor, I'm Ashley Abel. Trying to get as close to this as I can. For the defendants, appellees, the case before you is not SignaCourt v. Amara. In that case, there was no claim asserted under 1132A1B. That's the reason that the district court's analysis was spot on in this decision. Judge Curiel conducted an exhaustive review of all the summary judgment facts. We went through full discovery on issues that I'll touch on in just a minute. But it seems like, I understand what you're saying, it wasn't exactly the same case, but we really have to decide whether SignaCourt v. Amara abrogates the holdings in Forsyth and Ford. And given the discussion of the availability of equitable remedies in Amara, it seems as though the Supreme Court is implicitly holding that equitable remedies are available if relief isn't available under Section 1132A1B. Yes, Your Honor, I understand that. But this court does not need to reach that far or to reach that conclusion or to make findings on that because in the district court, significantly, there's no basis for reformation. Reformation requires either a mistake, which is no proof of that, or fraud. There's no proof of that. That's the reason discovery is significant. We went through... But we all seen fraud on the part of they're saying they wouldn't have, they wouldn't have picked, you know, that there were the hearings and AIG and Liberty were sort of competing for this and they're saying they wouldn't have gone with Liberty but for that representation. That's the... And the court wouldn't have approved it if Liberty had been forthright. That's not what the record reflects. What was... The reference that was made a few minutes ago by opposing counsel takes a brief statement during many hearings and takes a little bit and makes it this much. There was a representation during a hearing about the benefits that would be provided and the statement that was made, the reference to 3947 in the ER, is a transcript of a hearing. That hearing culminated in an order, the rehabilitation order. You have to remember, Your Honors, this was a company that was essentially in receivership by the state of California. It was not a viable entity. It was rescued by Liberty. And so this is not exactly the portrayal that the plaintiffs want to make it out to be that this was some gem of a company. It was in conservatorship. The statement that was made by Counsel for Liberty referenced benefits... It was probably mismanaged, huh? Yes, Your Honor. Yeah, but there were assets there. Certainly, Your Honor. There were people there. Correct. No doubt about that. You remember the equity funding fraud? Yes, Your Honor. Do you really? I read about it. How old was he? Fifty-five, almost. Really? Yes, Your Honor. The... I don't know if that's a positive or a negative, Your Honor. I'm glad you remember it because I handled that many, many years ago. And it was a failing company, huh? It was permeated with fraud, you know? Well, and that may have been what was involved with Old Golden Eagle. No, I don't know. But it was a valuable company. Right. And it was saved. And it went on. As a matter of fact, it was in the same field here. They were selling workers' comp insurance. And they were taken over 10 years ago by a British company. This Old Golden Eagle company still exists today because Liberty rescued it and propped it up and managed it properly. And the point that I was making is that in the conservatorship proceeding, there was not a misrepresentation about benefit accruals. That's what this case is about. But the important thing is to get the... It's important to keep the... I'm talking about the employees, the people that work in that company that were selling the product. You want to keep as many of those as you can. Yes, Your Honor. But the significant thing in this case is there's no misrepresentation to these employees. We went through almost 4 terabytes of discovery. And I'm not sure I fully comprehended before the discovery in this case how much 4 terabytes was. But it's a lot. And it cost a lot of money. And it took over a year to go through the discovery. Despite all... I don't know. What is a terabyte? A thousand gigabytes. A lot. Despite all that discovery, there has not been one shred of proof of fraud or any intentional or written misrepresentation. What was in those scripts, Judge Callahan, that you were talking about? It says credit will be given for vesting and eligibility. That's it. It didn't say... It did not misrepresent, like in the Cigna case. That's the reason I was making a distinction between this case and Cigna. Cigna did not involve denial of benefits claim. This one is a fully developed, 4,000-page administrative record that Judge Curiel had to go through and make specific findings. And he upheld the denial as reasonable. And despite all that evidence, there's not one shred of misrepresentation. That hearing that was held in the conservative court resulted in a rehab agreement that was given to all the employees, and it specifically says you will not get credit for benefit accruals. In the documents that were given, showing the AIG proposal, which was the other company looking at it, and Liberty Mutual specifically said neither one of these entities are offering a defined benefit plan historically, and there were no misrepresentations made in that. That was the rehab agreement, though, after this was already approved, and it was everyone... That was the approval. The rehab agreement was the order by the conservative court. It resulted in the rehabilitation agreement that was part and parcel of this. There is no misrepresentation made in that document. There was no misrepresentation made in the hearing that was referenced before about benefit accruals. That's different than vesting in eligibility. They were given credit for that. That's what was represented to them in the scripts, and that's what was given to them. They were given exactly what they were told they were going to receive. Now the question arises... First, this case began as misrepresentations. What was told to these four named employees, named plaintiff employees, and others? And then as you heard the case today, it's now morphed into an omission case. You didn't tell us what we never had. We also didn't tell them that they weren't going to get a Lexus or a Cadillac when they started employment. We didn't tell them a lot of things that they were going to receive as a result of coming to employment. They didn't ask about cars. They asked about benefits. And they specifically asked Liberty Mutual if they would be given service credit. And at one point, Liberty Mutual said, we're not sure. We'll check into it. And then at another point, there's an implication that they led the employees to believe that they would. So it's not about Lexus or cars or anything like that. It's about a specific request. They'll just cover us for service credits, and they were led to believe they would be. That was one request made by one of these 1,166. This was not a representation that was made to all employees. Like in the Cigna case, they published it in writing that they were going to get benefits beyond what they received before. That's not this case. That was testimony by one person about one request. The second most important thing is we have to remember, pension law in this country has historically been governed by what fiduciaries say. This is a fiduciary case. The person that was asked that was not a plan official. They had no involvement with the plan. Mr. Plavnicki was a former Golan Eagle employee, and he did not make a representation on behalf of the plan. No one followed up on that in writing. None of these named plaintiffs or any of the other class members made a request of plan officials about that issue. Number one, going to Judge Callahan's comment earlier, it's clear that you can't base the class on this. We object to class certification. That's a separate issue, but it plays into this a little bit because their case did begin. The allegations of the third amended complaint, second amended complaint, and the first complaint are all based on misrepresentations. That addresses the class issue and shows why fundamentally the class should not have been certified. Going back to the key issue, I think, that you've talked about earlier, is there's no evidence in this record of the basis for a surcharge award or a reformation or a stopple. Well, let me ask you this, though. I'm trying to work through every scenario just in terms of digging my... I'm not an ERISA lawyer, and I don't know that I really aspire to be one, but I really... I roll my slaves up on these cases and do my best. Now, you've said that Amara, you know, we don't need to go there, but let's assume we go there just for purposes of argument right now. Assuming we withhold that Cigna-Core v. Amara, a plaintiff can simultaneously assert claims under 1132a1b and 1132a3. If we got there, wouldn't we have to remand for further proceedings on count two? No, Your Honor, you don't, because this was a fully-developed summary judgment record. Judge Curiel held... But the district court said, I'm not going to get... You know, I don't think... You cannot do that, and that's why I'm finding in favor of you, of the appellee, because you can't entertain both of those, and therefore that's why you lose on that. Right. Well, there's still a question about whether that is... should be your holding, would be your holding. I know, you're not conceding that. I recognize that. Because this is not like Cigna-Core. This is a fully-developed administrative record. 4,000 pages. Judge Curiel had to wade through it. So you don't need... But just humor me. All right. If we did go there. All right. If we did go there. And I'm not saying we would, but I'm just trying to think through... I understand. While we have the experts here, I want to think through every scenario, and I... not whether I agree with you or not, but I want to understand all the consequences of it. Judge Curiel also held... that there was no actual harm. That's one of the precepts of AMARA. You have to show harm and causation. Judge Curiel has already found, in this opinion, that there was no actual harm. Without actual harm, the surcharge remedy goes by the wayside. And, Judge Bastien, going to the point that you raised a few minutes ago, you don't even need to get there because the alleged representations were not by fiduciaries. You can't have a fiduciary breach without a fiduciary undertaking that action. The fiduciary would be someone speaking on behalf of the plan. And that's not what was alleged. Factually, you can't get there. There's no facts to remand for Judge Curiel to consider. So, surcharge goes out for several different reasons. Reformation, there's no fraud here. They have strained this case through four terabytes of data, and there's no evidence of a scheme by Liberty Mutual to defraud these individuals. No evidence whatsoever. And, as far as Estoppel is concerned, this court has made it clear in numerous decisions that you have to have detrimental reliance and extraordinary circumstances. And none of those can be found in this record. So, there would be no reason for this court to remand the decision because there's an absolute absence of proof of any of the remedies that the Amara court talked about. Well, I guess if 29 CFR Section 2520.102-2A requires the summary plan description to be written in a manner to be understood by the average plan participant, if we're spending this much time on this, does the average plan participant really understand the difference between eligibility, vesting, and accrual? If not, why were the summary plan descriptions sufficient? The summary plan descriptions are sufficient because they say exactly what benefits will be given. And the key thing, I think, to keep in mind here is that... Even if no one can understand it? The reasonable person can't understand it? Well, they have avenues. Number one, ERISA says that you can request the plan documents and summary plan descriptions if you don't have them. Number two, you can go to plan officials. That's the proof that's missing in this case. If you have a question about what your plan provides, if you don't want to go to your own lawyer, accountant, or other financial advisor, then you go to a plan official. There's no evidence in this case whatsoever that any of these individuals of the 1,166 class members seeking $50 million, according to plaintiff's expert in this case, there's no evidence that any of them went to a plan official and made a legitimate formal request. The only time that was ever done by these plaintiffs was after we had to come to this court previously in response to Mr. Moyle's 2005 lawsuit to tell him he has to exhaust administrative remedies. We've been here before. This court told him he had to exhaust administrative remedies or he could certainly pursue a claim. Anyone can pursue a claim. It was untimely. We've argued statute of limitations, statute of repose. Your Honor remarked on that earlier. We've argued class certification. But as to the Amara issue, there are no facts to remand. There's no evidence of surcharge that could form the basis of surcharge, reformation, or estoppel. Well, you know, Mike, as I read this, the employees, now how many of them are there? 1,166. I'm talking about the employees of the company that were taken over. That's the class. That is the group. 1,166. 1,166? Yes, Your Honor. I think he might be asking not the class, the whole all liberties employees. All of liberties employees? Oh, thousands. Yes. Huh? Thousands. Of liberty employees? Of liberty employees. Old employees. The liberty employees, but I'm talking I'm talking about the Old Golden Eagle. Yeah, Golden Eagle. That's the 1,166. That was Old Golden Eagle. When they came over to New Golden Eagle, that's how many employees came on board. I think it was the vast majority, 90 plus percent of the employees came on board with New Golden Eagle when Liberty purchased it. So that is the class. 1,166. From Golden Eagle. Yes, Your Honor. And so they conducted meetings. It was referenced by opposing counsel. And in those meetings, and it's on the script, it was on an overhead, it says eligibility for vesting and, excuse me, prior service credit was given for vesting and eligibility, not for benefit accruals. It was never represented that they would get prior service credit. And significantly, Old Golden Eagle did not have a defined benefit plan. We're talking about one of the most lucrative benefit plans that this country has ever had. In fact, they're so lucrative most companies now are getting away from them. That's exactly what was happening in the Cigna case. They were getting away from a defined benefit plan and going to a cash balance plan. And when they did the conversion, they didn't do it accurately. And they ended up giving some employees less benefits than they had under the lucrative defined benefit plan. So what would typically happen if you are buying a company and it has a defined benefit plan, like we're talking about, which Old Golden Eagle did not, but if it had one, then what would be in the documents before the conservatorship court and the merger and acquisition documents would have all included trust money under that plan coming into Liberty Mutual. That's when you give past service credit for benefit accruals. It's when you're acquiring a company that has a similar plan and they're giving you those assets. That's when you tell employees that you will get benefit accrual credit. And that would have been on the slide if that were the case. But that is not the case. That's not this case. It's never been alleged. Could not be alleged. There's no genuine issue of fact in all the issues that I've been talking about. Any of the remedies that we're talking about. And because there were no trust assets coming over, they got service credit for things that they really didn't have to give in terms of Liberty Mutual. They didn't have to give past service credit for vesting where they could immediately come into the plan. They didn't have to give past service credit for eligibility. Because usually you have to wait a certain period of time to participate. Explain to me just, okay, what you're saying was covered. So when they come over to Liberty Mutual, then they immediately can join the plan. Correct. Which if they hadn't, that's not necessary. How long does a normal Liberty Mutual have to wait to join the plan? I'm not sure that's in the record. I think most companies for a defined benefit plan, there's a waiting period of like 60 days to be eligible. And then you vest after a stated period of time. Usually in a defined benefit plan, it's a five-year period. So like five years. But in their case, say if you had three years at Golden Eagle. Golden Eagle, yes. Then when you came to Liberty Mutual, after two years, you would be vested. Correct. In whatever you had put in for the two years. Well, it's not based on what you put in. It's not a 401k. Is there a surplus in the Liberty Mutual plan? Not that I know of, Your Honor. I don't know that that's in the record, but I think it's adequately funded. I don't think there's a surplus. I'm sorry, can you restate that, Your Honor? Okay, so say like, if I start at, if I don't have any, I would vest earlier with Liberty Mutual. Right, and the way defined benefit plans work is different than a 401k, because that's based on how much money you put in. Defined benefit plans are based upon your years of service times a salary calculation. And that's very important. One of the representations that was mentioned by the plaintiffs in their briefing is at 1830 in the ER. That was a telephone call made by Mr. Moyle. It was represented that that was about benefit accrual. If you read it, it has nothing to do with benefit accrual. That was not a representation about benefit accrual. It was about how you calculate my final pay, which goes to your question. So you take pay times years of service and there's a calculation. That's all money from the employer. It's not based upon what the employee put in. That's the reason this trust idea of assets coming over is so critical in this area of law. All right, so just so I see this through. Why is it that critical? Because it's $50 million. If Liberty Mutual wanted to include the employees from the old company, they could have done that. Oh, absolutely. They could have done it. You're acting like they couldn't have done that. No, they could have done it. They've got a plan that brings you in there. But the time, speaking, just think about this from a business standpoint. And these employees were valuable to Liberty Mutual. Right. Yeah, because you want to bring in these folks that were working in the company that had nothing to do with the ups and downs of it. And you want them in. They know the customers. They're valuable, aren't they? So what's so unusual about having them come in and participate in a retirement plan? Because, Your Honor, pension plans, this calculation that you're talking about, the years of service times some salary calculation is premised on the whole idea that you've been working for that company. Yes, they could have given them that benefit credit. But the evidence is they never intended to do that. They never represented to anyone that they were going to do that. And the employees weren't entitled to it. There's a conflict on that, as I see it. You have a conflict. The employees said that they're with the company. They said, you know, they wanted us. And somehow they got the impression that they were going to get this benefit. And here's how they got that impression. They assumed. They submitted declarations and I took their depositions. Even when you talk about vesting and this and that and the rest, you know, there's an assumption in there that you read it. Yeah, they're going to take care of us. They're going to take care of us. Well, they made that as an assumption. They were never told that. And I think that's a critical fact in this case. They're lay people. You need to lay it out for them. Was there anything where there was a document that said, you will not be a part of our ERISA plan? But they were part of the plan. We made them. I'm way over on my time. But we gave them exactly what we told them they would get, Your Honor. Do you have something in there that says that when it comes to determining your benefits under our ERISA plan, we will not consider the time that you spent with, I don't know why I have trouble remembering the name of it. Old Golden Eagle. Old Golden Eagle, yeah. Maybe I don't like the old. I agree with you, Your Honor. They were told that specifically in the rehabilitation agreement, which the evidence shows was given to all the employees. They also had the ability to ask questions of plan officials, and they did not do that. The record is... Something in writing that these people got, you will not, you will, sure, you can be part of our ERISA plan, but you're not going to be getting credit for the time that you worked for Golden Eagle. But, Your Honor, we did give them credit for some purposes, and the point of what the people did on behalf of the plan is they told them what they would get, and they did get credit for some of their time for certain purposes, and that's what we told them. Thank you, Your Honor. Well, if you put in this word, what was it? Only? Solely. Solely. When did that get in? 2009 was when that was put in place, and, Your Honor, we would argue that that is sort of like a subsequent remedial measure that you don't want to punish a plan official for making something clear because, remember, Mr. Moyle started suing us in 2003. I got the complaint in 2003. I've been dealing with this lawsuit since then, and so they had the ability, and they knew that, Mr. Moyle, at least, knew that his benefits were denied as of 2003, which goes to the statute of repose issue that we raised. Thank you, Your Honor. Oh, statute of repose. All right. I have a very short time here, so I want to address four quick things if I can. First of all, Your Honor, statute of repose. The statute of repose is 1113-2, and it is for 502A3 claims. There is no six-year statute of repose for the A1B claim. The statute was raised on appeal on the A1B claim, not the A3 claim. So the statute of repose is mixing apples and oranges. Second, AMARA. AMARA absolutely applies here, and it applies because it had a failure-to-disclose issue in it. One of the main things that Cigna failed to do when transferring from a defined benefit to a cash balance plan, they failed to tell the employees that there was an interest rate risk and that that interest rate risk fell on the employees. And the Supreme Court found that there was an A1B claim, contrary to what opposing counsel said. There was an A1B claim, and AMARA was trying to reform the plan under A1B. The Supreme Court said, no, you don't reform plans under A1B. You reform plans under A3. This case is an A3 claim for a failure-to-disclose, a material fact that employees needed to know for making decisions about their retirement, just like AMARA. Second, AMARA talks about fraud and what type of fraud you need to prove for reformation. It's based on contract theory, and the site that AMARA cited to was actually, rather than going back to the old equity court days, AMARA relied on a treatise. And the treatise is the treatise on equity, Pomeroy Treatise on Equity, section 873, the fifth edition, 1941. And what AMARA found was that the fraud that you need for reformation is not common law fraud, but rather you need to show there was inequitable conduct, inequitable conduct, unconscientious conduct, or a violation of good faith. Now there's a dispute whether you need to show an intent or not for that fraud. What we ask for in this case is reformation because there was inequitable conduct, a bad faith act by the fiduciary here, in failing to disclose a material fact. Now it's not disputed that that fact is material. In fact, Liberty's own expert and Liberty's 30B6 deponent admitted materiality. Both of them admitted materiality. So that you can find in the record at ER 2788 to 2789 and ER 2062. They both admit materiality of benefit accrual and they admit that a promise or a lack of promise for past service credit for benefit accrual is material. So why didn't they tell him? $50 million. What did you say? You just dropped your voice. $50 million is why they didn't tell him. I see. What evidence do we have that they intentionally didn't tell him? The hearing transcript, 3749. They told the court they'd do it. They didn't do it. What other evidence do we have? They prepared a golden opportunity human resources analysis which identified a perceived value problem. A perceived value problem for employees transferring from a direct pay compensation plan to an indirect pay compensation plan. So they had to develop a communication strategy and they did. You can find that at ER 1721 and specifically ER 1727. Now, we made a big deal about 4 terabytes of information. This is an omission case. We had to get a lot of information and it uncovered a mountain of evidence that they knew they weren't going to give it, they knew it was material, and they didn't tell him to save $50 million. Thank you for your time. Well, that concludes our session this morning and we'll recess until 9 a.m. tomorrow morning. Thank you.
judges: Bastian, Pregerson, Callahan